Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/02/2021 08:09 AM CDT

State of Nebraska, appellee, v.
Maurice L. Briggs, appellant.
___ N.W.2d ___

Filed January 8, 2021.    No. S-19-300.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

3. **Warrantless Searches.** Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.

4. ____. The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

5. **Constitutional Law: Search and Seizure: Arrests.** Postarrest inventory searches are constitutionally permissible, and the propriety of such searches is judged by the Fourth Amendment standard of reasonableness.

6. **Search and Seizure: Police Officers and Sheriffs: Arrests.** Postarrest inventory searches are considered reasonable because they serve at least three governmental caretaking functions unrelated to criminal investigation: (1) protecting the owner's property while it remains in police custody, (2) protecting the police against claims that they lost or stole the property, and (3) protecting police from potential danger.

7. **Search and Seizure.** Inventory searches conducted according to established policy are reasonable.

8. ____. The reason for requiring inventory searches to be regulated by standardized criteria is that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.

9. **Criminal Law: Search and Seizure: Police Officers and Sheriffs.** A standardized policy or procedure governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime.

10. **Constitutional Law: Search and Seizure: Police Officers and Sheriffs.** Only reasonable police regulations relating to inventory procedures administered in good faith will satisfy the Fourth Amendment. A reasonable inventory search policy has two key features: it must be designed to produce an inventory and it must limit officer discretion regarding when and what to search.

11. **Constitutional Law: Search and Seizure: Proof.** It is the State's burden to show a search falls within the inventory search exception, and a failure of proof on the State's behalf requires a finding that the search suffered from constitutional infirmities. The State can generally meet its burden by proving the inventory search was conducted pursuant to reasonable standardized procedures governing inventory searches.

12. **Constitutional Law: Search and Seizure: Police Officers and Sheriffs: Proof.** A written inventory search policy is recognized as the best means by which to prove the existence and requirements of a standardized procedure, but there is no constitutional requirement that inventory policies be established in writing. Officer testimony can also establish the existence of a standard procedure and show that the search was conducted in accordance with that procedure.

13. **Constitutional Law: Search and Seizure: Proof.** The State generally meets its burden of showing an inventory search was reasonable under the Fourth Amendment when it proves the search was governed by, and conducted in accordance with, standardized procedures.

14. **Constitutional Law: Search and Seizure.** The failure to strictly follow established policy does not render an inventory search unconstitutional per se.

15. **Appeal and Error.** In determining whether a trial court's findings of historical fact are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses.

Petition for further review from the Court of Appeals, Pirtle, Riedmann, and Welch, Judges, on appeal thereto from the District Court for Douglas County, Peter C. Bataillon, Judge. Judgment of Court of Appeals reversed and remanded with directions.

Thomas C. Riley, Douglas County Public Defender, and Bethany R. Stensrud for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

The district court denied Maurice L. Briggs' motion to suppress evidence found during a warrantless search of his vehicle, reasoning the search fell within the inventory search exception to the Fourth Amendment. Briggs was subsequently convicted of two counts of possession of a controlled substance. He appealed, challenging the denial of his motion to suppress, and the Nebraska Court of Appeals affirmed. On further review, we conclude the State failed to meet its burden of proving the search fell within the inventory search exception. We therefore reverse the decision of the Court of Appeals and remand the cause with directions.

## I. BACKGROUND

### 1. Traffic Stop

In December 2017, officers from the Omaha Police Department (OPD) responded to a report of an assault in progress in a shopping center parking lot. When Officer Joe Eischeid arrived on the scene, witnesses reported that the people involved in the disturbance were leaving in a black Jeep. Eischeid followed the Jeep to a nearby auto parts store, where it pulled in and parked. Eischeid activated the lights on his

cruiser and pulled in behind the Jeep. The encounter that followed was recorded on the cruiser's camera and on Eischeid's body camera. Eventually, two more police officers arrived to provide backup.

A man and a woman exited the Jeep, and both reported having a verbal argument in the shopping center parking lot, but they denied the argument was physical. Both occupants provided officers with their names and birth dates, and police ran a records check. That check showed the female passenger had a history of drug-related convictions. Police asked the woman several times for permission to search her purse, and she consistently refused. She also told police that nothing in the Jeep belonged to her. The female passenger was eventually allowed to leave the scene.

Police were unable to locate any record for the name and birth date given by the male driver. A check of the Jeep's license plate showed it was registered to Briggs, and the photograph of Briggs in the police database matched the male driver of the Jeep. The database also showed Briggs had gang connections, his Nebraska license was suspended, and he had outstanding arrest warrants. Briggs was arrested on the warrants, as well as driving on a suspended license and supplying false information to a police officer. Police asked Briggs for consent to search the Jeep, but he refused. Police also called for a "K-9 unit," but it never arrived.

## 2. Vehicle Search

After Briggs was arrested and placed in the police cruiser, two OPD officers searched the Jeep. On Eischeid's body camera, he can be heard asking another officer if it was to be a "search incident to arrest," and the other officer replied, "No, it's an inventory search."

Footage and audio from the police cameras shows the Jeep was full of property, including multiple phone chargers, electronics, a credit or debit card, a wallet, at least two sets of license plates, a pair of tennis shoes, a tablet computer, a

jacket and other clothing, and several suitcases. During the search, officers found a black bag which contained Briggs' wallet, identification card, Social Security card, and several smaller bags containing suspected drugs. After the suspected drugs were found, one officer can be heard saying, "Well, there you go, there's that felony you were waiting on, there it is."

It is undisputed that officers did not create an inventory report of the property inside the Jeep. They did, however, prepare what they described alternatively as an "evidence report" or "property report," listing the items seized as evidence, which included the black bag, the suspected drugs and drug paraphernalia, and a license plate. The suspected drugs later tested positive for cocaine and methamphetamine, and Briggs was charged with two counts of felony possession of a controlled substance. He moved to suppress the evidence found during the warrantless search of his Jeep, arguing it was obtained in violation of his rights under both the U.S. and Nebraska Constitutions. The State generally resisted the motion by asserting that OPD officers had conducted a proper inventory search.[1]

## 3. Motion to Suppress

### (a) Evidence

At the motion to suppress hearing, the State offered footage from Eischeid's cruiser camera and body camera. That footage is generally consistent with the facts outlined above. The State also adduced testimony from two of the three officers involved in the search.

### (i) Officer Eischeid

Eischeid generally described the facts as detailed above. He also testified that once police discovered there were

---

[1] See, e.g., *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019) (recognizing inventory search is exception to Fourth Amendment's warrant requirement).

active warrants for Briggs' arrest, they handcuffed him and placed him in the cruiser. Eischeid testified that after Briggs was arrested, the plan was to impound the Jeep for safekeeping. The State did not ask Eischeid about OPD's policy on impounding vehicles or conducting inventory searches.

On cross-examination, Eischeid admitted that after Briggs was arrested, Eischeid said to the other officer, "I get to search that car now, I can't wait . . . ." Ultimately, however, Eischeid testified that he searched only the "armrest glove box" and front passenger areas of the Jeep, looking for keys. After that, he primarily stayed with Briggs while two other officers conducted a search of the Jeep. Eischeid admitted that when he looked in the glovebox, he saw a wallet with credit cards, debit cards, a gift card, and cash, but he did not prepare an inventory report of any items.

### (ii) Officer Hansen

Officer Tyler Hansen arrived on the scene shortly after Eischeid, and Hansen was one of the officers who searched Briggs' Jeep. The State asked Hansen the following questions about OPD's policy on postarrest inventory searches:

Q. Okay. Does OPD have a policy on impounding vehicles and a search prior to impounding vehicles?

A. Uh, yes, when we take control of a vehicle to tow it to our impound lot we do an inventory search of it.

Q. Okay. And what's the purpose of an inventory search?

A. To make sure there's no high value items in the vehicle or any dangerous substances or anything like that.

Q. Are there any policies about how you go about doing a search or documentation of that search?

A. Um, we just conduct a search and then if we find any high value items or anything we'll book it into property.

Hansen testified the inventory search of Briggs' Jeep was "conducted in accordance with OPD standard operating

procedures," but the State did not ask Hansen what those procedures were, nor was a copy of the inventory search policy offered into evidence.

More specific details regarding OPD's inventory search procedures were elicited on cross-examination, when defense counsel asked Hansen the following questions:

Q. Inventory searches are supposed to be conducted according to [OPD] policy, correct?

A. Yes.

Q. And there are only a few reasons why you can do an inventory search, right?

A. Yes.

Q. One of them being to catalog property prior to the vehicle being taken into police possession, correct?

A. Correct.

Q. To protect [OPD] from allegations of mishandling of property, correct?

A. Correct.

Q. To accurately track property in possession of [OPD]?

A. Correct.

Q. And those are the only reasons why, correct?

A. Yes.

. . . .

Q. Your manual specifically says these are not searches, correct?

A. Correct.

Q. You're not supposed to be inventorying a vehicle to look for evidence of a crime, correct?

A. Correct.

Q. When choosing to do an inventory, you must do it thoroughly, right?

A. Yes.

Q. You are instructed that you must cover all areas of normal access in which property would reasonably be expected to be placed, correct?

A. Yes.

Q. Including the front seats?

A. Correct.

Q. The back seats?

A. Yes.

Q. The glove compartment?

A. Yes.

Q. And the trunk?

A. Yes.

Q. There was a lot of property in that car, wasn't there?

A. Yes.

Q. The car was packed to the brim, wasn't it?

A. Yep.

Q. Stuff was even falling out of the back hatch when you opened it, right?

A. Correct.

. . . .

Q. Okay. When you inventory a car, you're supposed to document all the property you find, right?

A. Any, yes.

Q. Again, the purpose is to protect [OPD] from saying anything was lost, stolen, or misplaced for your protection, correct?

A. Correct.

Q. So there must have been a long inventory log?

A. Uh, I don't believe so.

Q. An inventory log is different than a property report, isn't it?

A. I believe so.

Hansen agreed that the purpose of a property or evidence report "is to itemize . . . the evidence that was collected for purposes of trial," while the "purpose[] of an inventory log [is] to protect [OPD] from being sued later if items are misplaced." Hansen admitted he did not prepare an inventory log following the search of the Jeep, and he did not know whether any other officer did so. No inventory log was offered by the State.

On redirect examination, the State asked Hansen whether "there [was] anything of true value" found during the search of the Jeep and he replied, "What we found [was] lots of bags of clothing and wigs." When asked whether it was "feasible to document all property in this case," Hansen responded that due to the amount of property in the Jeep, officers "just decided to document only the main — the high value important things." On recross-examination, Hansen admitted that OPD's policy manual on inventory searches states that officers are "supposed to inventory all property" and the manual "doesn't mention anything [about] whether it's valuable or not."

(b) District Court Ruling

The district court overruled the motion to suppress. It found that OPD policy allowed officers to impound the Jeep for safekeeping because Briggs had been arrested and the Jeep was parked on private property. The court also found that once the decision was made to impound the Jeep, OPD policy authorized an inventory search to protect Briggs' property and to protect police from false accusations that the property was not safeguarded. But the court made no express factual findings as to what OPD's standardized procedures required, nor did the court make an express finding that officers complied with those procedures in conducting the search of Briggs' Jeep.

The court did find that officers had not prepared an inventory log after searching the Jeep, and it acknowledged that "one would expect an inventory to be done." But it found "the completion of an inventory [was] not necessary," reasoning:

> For the officers to go through a car that was "filled to the gills" and make an inventory of each of the various items in the car would be a waste of the time of the officers. As such, the officers, basically, decided [to] impound the car as is and any accusation by [Briggs] as to property missing would be meaningless as the officers considered all the property basically junk.

Based on these factual findings, the court overruled the motion to suppress, concluding "the inventory search by the police officers [was] proper, reasonable, and not unconstitutional."

### 4. Stipulated Trial
### and Sentencing

Following a stipulated bench trial at which Briggs preserved the motion to suppress, he was convicted of two counts of possession of a controlled substance. Briggs was sentenced to consecutive 30-month terms of probation. He filed a timely appeal, challenging only the denial of his motion to suppress.

### 5. Court of Appeals

Before the Court of Appeals, Briggs argued the district court erred in denying his motion to suppress. He advanced two theories for why the State could not rely on the inventory search exception: (1) officers failed to comply with OPD's standardized inventory search procedures because they did not prepare an inventory report and (2) officers used the pretext of an inventory search to conduct a general search for incriminating evidence.

Addressing the first theory, the Court of Appeals noted officers had not prepared any inventory report after searching the Jeep, but it considered the evidence "not that clear"[2] as to what OPD's procedures actually required concerning cataloging property found in an inventory search. Noting that Hansen's testimony was the only evidence on this issue, the Court of Appeals was unsure whether OPD's procedures required police to catalog all property found in the vehicle, or just all "high value" property. The Court of Appeals suggested the uncertainty in Hansen's testimony could have been cleared up by offering the written policy, noting that "Briggs' counsel referred to OPD's 'manual' in questioning [Hansen]

_____

[2] *State v. Briggs*, 28 Neb. App. 65, 81, 940 N.W.2d 582, 594 (2020).

about OPD's policies but, for whatever reason, did not offer OPD's written policies into evidence or clarify if written policies existed."[3] But, similar to the district court, the Court of Appeals did not squarely address what OPD's inventory search procedures required or whether officers had complied with those procedures.

Instead, the Court of Appeals reasoned it was not necessary to decide whether OPD's policy required police to inventory all property, or just all high value property, because "[e]ither way,"[4] the evidence showed no inventory report had been prepared. Noting that Briggs "[d]eem[ed] this a failure to comply with OPD's stated policy,"[5] the Court of Appeals proceeded to consider whether, under our holding in *State v. Nunez*,[6] the search could still be considered reasonable under the Fourth Amendment despite the failure to prepare an inventory.

Applying *Nunez,* the Court of Appeals framed the ultimate question in Briggs' appeal as whether police used the inventory search as "simply pretext for a general rummaging by the police in order to discover incriminating evidence."[7] To that question, the Court of Appeals understood the district court to have made a historical finding of fact that the failure to prepare an inventory log was not pretextual. It reviewed that finding for clear error, and it found none. It therefore affirmed the overruling of Briggs' motion to suppress, but cautioned that the failure to prepare an inventory report pursuant to established procedures "could lead a future court to conclude that a search does not qualify as an inventory search."[8]

We granted Briggs' timely petition for further review.

---

[3] *Id.* at 78, 940 N.W.2d at 592.

[4] *Id.* at 82, 940 N.W.2d at 594.

[5] *Id.*

[6] *State v. Nunez*, 299 Neb. 340, 907 N.W.2d 913 (2018).

[7] *Briggs, supra* note 2, 28 Neb. App. at 83, 940 N.W.2d at 595.

[8] *Id.* at 94, 940 N.W.2d at 601.

## II. ASSIGNMENT OF ERROR

On further review, Briggs broadly assigns that the Court of Appeals erred in affirming the denial of his motion to suppress.

## III. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[9] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[10]

## IV. ANALYSIS

[2-4] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.[11] Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.[12] The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.[13] In this case, the State relies exclusively on the inventory search exception to justify the warrantless search of the Jeep, and we limit our analysis accordingly.

[9] *State v. Saitta*, 306 Neb. 499, 945 N.W.2d 888 (2020).

[10] *Id.*

[11] *Garcia, supra* note 1.

[12] *Id.*

[13] *State v. Degarmo*, 305 Neb. 680, 942 N.W.2d 217 (2020).

## 1. Inventory Search Exception

[5,6] Both the U.S. Supreme Court and this court have consistently held that postarrest inventory searches are constitutionally permissible[14] and that the propriety of such searches is judged by the Fourth Amendment standard of reasonableness.[15] Inventory searches are considered reasonable because they serve at least three governmental caretaking functions unrelated to criminal investigation: (1) protecting the owner's property while it remains in police custody, (2) protecting the police against claims that they lost or stole the property, and (3) protecting police from potential danger.[16]

[7-9] It is widely recognized that "inventory searches conducted according to established policy are reasonable."[17] We have consistently explained that the reason for requiring inventory searches to be regulated by standardized criteria is that

> "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime[.]'"[18]

---

[14] See, e.g., *Florida v. Wells*, 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990); *Colorado v. Bertine*, 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987); *Illinois v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976); *Garcia, supra* note 1; *Nunez, supra* note 6; *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996); *State v. Filkin*, 242 Neb. 276, 494 N.W.2d 544 (1993).

[15] *Id.*

[16] See, *Garcia, supra* note 1; *Nunez, supra* note 6. Accord, *Bertine, supra* note 14; *Lafayette, supra* note 14; *Opperman, supra* note 14; *Newman, supra* note 14; *Filkin, supra* note 14.

[17] *Nunez, supra* note 6, 299 Neb. at 346, 907 N.W.2d at 917. Accord, *Bertine, supra* note 14; *Lafayette, supra* note 14; *Opperman, supra* note 14.

[18] *Newman, supra* note 14, 250 Neb. at 238, 548 N.W.2d at 749, quoting *Wells, supra* note 14. See, also, *Nunez, supra* note 6; *Filkin, supra* note 14.

[10] The particular procedures for conducting inventory searches are left largely to local law enforcement agencies,[19] but the U.S. Supreme Court has made clear that only "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment."[20] A reasonable inventory search policy has two key features: it must be designed to produce an inventory[21] and it must limit officer discretion regarding when and what to search.[22]

[11,12] It is the State's burden to show a search falls within the inventory search exception,[23] and a failure of proof on the State's behalf "requires a finding that the search suffered from constitutional infirmities."[24] The State can generally

---

[19] See *Lafayette, supra* note 14, 462 U.S. at 648 (noting Court was "hardly in a position to second-guess police departments" as to practical administrative methods that would best deter claims of theft). Accord, Wayne R. LaFave, *Controlling Discretion by Administrative Regulations: The Use, Misuse, and Nonuse of Police Rules and Policies in Fourth Amendment Adjudication*, 89 Mich. L. Rev. 442, 454-55 (1990) ("it is appropriate to expect the police agency in the first instance to make a judgment about exactly what kind of routine is needed to serve those governmental interests in that particular locality").

[20] *Bertine, supra* note 14, 479 U.S. at 374. See *Lafayette, supra* note 14.

[21] *Wells, supra* note 14; *Bertine, supra* note 14; *Opperman, supra* note 14; *Nunez, supra* note 6. See, also, *Newman, supra* note 14; *Filkin, supra* note 14.

[22] *Wells, supra* note 14, 495 U.S. at 8 (Brennan and Marshall, JJ., concurring) (recognizing inventory searches are reasonable under Fourth Amendment only if "done in accordance with standard procedures that *limit* the discretion of the police"); *Opperman, supra* note 14, 428 U.S. at 384 (Powell, J., concurring) (explaining that in proper inventory search, "no significant discretion is placed in the hands of the individual officer: he [or she] usually has no choice as to the subject of the search or its scope"). See, also, *Nunez, supra* note 6; *Newman, supra* note 14; *Filkin, supra* note 14. Accord LaFave, *supra* note 19 at 461 (explaining that to be reasonable, regulations on inventory searches must "impose realistic limits on police discretion").

[23] *Newman, supra* note 14; *Filkin, supra* note 14.

[24] *Filkin, supra* note 14, 242 Neb. at 284, 494 N.W.2d at 550.

meet its burden by proving the search was conducted pursu-
ant to reasonable standardized procedures governing inven-
tory searches. [25] And while a written policy is recognized as
the best means by which to prove the existence and require-
ments of a standardized procedure, there is no constitutional
requirement that inventory procedures must be established
in writing. [26] We have recognized that officer testimony can
also "establish the existence of a standard procedure and
[show] that the search was conducted in accordance with that
procedure." [27]

[13] The State generally meets its burden of showing an
inventory search was reasonable when it proves the search
was governed by, and conducted in accordance with, standard-
ized procedures. [28] But in *Nunez*, we generally agreed with the
Eighth Circuit Court of Appeals that the failure to strictly fol-
low standardized procedures does not automatically render an
inventory search unreasonable per se. [29]

*Nunez* explained that reasonableness under the Fourth
Amendment cannot be fixed by per se rules; it must be deter-
mined by all the facts. [30] An inventory search conducted pur-
suant to standardized procedures is recognized as reasonable
because it serves important governmental caretaking functions
unrelated to criminal investigation [31] and ensures the search

---

[25] See *Filkin, supra* note 14.

[26] *Id.* See, also, 3 Wayne R. LaFave, Search and Seizure, A Treatise on the
Fourth Amendment § 7.4(a) (6th ed. 2020) (noting officer testimony of
standard inventory search procedure can be sufficient, but better practice
is to produce written policy).

[27] *Filkin, supra* note 14, 242 Neb. at 285, 494 N.W.2d at 550.

[28] See *Filkin, supra* note 14 (summarizing U.S. Supreme Court precedent
as requiring that inventory searches, to be reasonable, must be conducted
pursuant to standardized policies or established procedure).

[29] *Nunez, supra* note 6.

[30] *Id.*

[31] See *id.*

is not "'"turned into 'a purposeful and general means of dis-
covering evidence of a crime.'"'"[32]

[14] But *Nunez* held that the "failure to strictly follow
established policy does not render an inventory search uncon-
stitutional per se."[33] Instead, when the evidence shows that
officers failed to strictly follow standardized procedures, *Nunez*
instructs that a court should consider whether, despite the non-
compliance, the inventory search was still reasonable under
the Fourth Amendment. To make that determination, a court
considers all of the facts surrounding the search, including the
nature of the noncompliance, in order to determine whether
the evidence suggests the search was designed to produce an
inventory and satisfy the government's caretaking function, or
whether it instead "raise[s] an inference that the search was not
designed to produce an inventory, but to discover incriminat-
ing evidence."[34]

On further review, Briggs argues the Court of Appeals mis-
applied the State's burden of proof and impermissibly shifted
that burden by suggesting defense counsel should have done
more to clarify the content of OPD's inventory search policy.
Briggs also argues the Court of Appeals misapplied this court's
holding in *Nunez*.[35] We find merit in both arguments.

## 2. State Failed to Meet
### Its Burden of Proof

The State offered surprisingly little evidence to support its
contention that the search of Briggs' Jeep was conducted pur-
suant to a standardized inventory search procedure and thus
fell within the inventory search exception. The State did not

---

[32] *Id.* at 346, 907 N.W.2d at 918.

[33] *Id.* at 348, 907 N.W.2d at 918, citing *U.S. v. Rowland*, 341 F.3d 774,
780 (8th Cir. 2003) ("[e]ven when law enforcement fails to conduct a
search according to standardized procedures, this does not mandate the
suppression of the evidence discovered as a result of the search").

[34] *Id.* at 349, 907 N.W.2d at 919.

[35] *Nunez, supra* note 6.

offer or allude to a written inventory search policy, and when questioning Hansen, it adduced little more than conclusory statements that OPD had a standard policy, that the purpose of the policy was to "make sure there's no high value items in the vehicle," and that the search of Briggs' Jeep was "conducted in accordance with" that policy.

On cross-examination, defense counsel questioned Hansen more directly about the specific details of OPD's procedures, at times appearing to quote directly from OPD's manual. On cross-examination, Hansen testified that OPD's manual authorized inventory searches "to catalog property prior to the vehicle being taken into police possession" and "[t]o protect [OPD] from allegations of mishandling of property." He testified that when conducting an inventory search, officers are instructed to be "thorough[]" and to "cover all areas of normal access in which property would reasonably be expected to be placed." He further testified that OPD's policy manual says officers are "supposed to inventory all property" and "doesn't mention anything [about] whether it's valuable or not."

Considered in its entirety, Hansen's testimony may have been sufficient to show that OPD has adopted standardized procedures to govern inventory searches, but it failed to establish what those procedures were. Hansen's testimony was the only evidence regarding the content of OPD's standardized procedures, and we agree with the Court of Appeals that his testimony was, at best, equivocal on what those procedures required.

Specifically, it was unclear from the evidence whether OPD's procedures require officers to catalog all property found in a vehicle, or just "high value" property. Clarity on this issue was important because if OPD's procedures require that all property be cataloged, the failure to prepare an inventory report would show noncompliance. But the failure to prepare an inventory would not necessarily show noncompliance if OPD's procedures required that only "high value" property be cataloged and officers found no such property. We

express no opinion on whether a policy that does not require all property to be listed on the inventory report could satisfy constitutional requirements,[36] because that question is not before us.[37] Actually, the State's failure to prove what OPD's standardized procedures required makes it difficult to reach any conclusion about whether those procedures met constitutional requirements.

We pause here to address Briggs' argument that the Court of Appeals impermissibly shifted the burden of proof by suggesting the defense should have offered OPD's manual into evidence to clear up the confusion as to what it required. We do not understand the Court of Appeals to have shifted the burden. But to the extent its opinion can be read to suggest that Briggs should have offered evidence to clarify the requirements of OPD's policy, we expressly disapprove of such a reading. It is the State's burden to prove an inventory search was conducted pursuant to standardized procedures,[38] and the State alone bears responsibility for meeting, or not meeting, that burden.

Here, even after the defense inquired into specific provisions of OPD's inventory search policy on cross-examination, the State appears to have treated the contents of OPD's policy as a well-kept secret. It made no effort to clarify the requirements of OPD's procedures or to show that officers complied with those procedures. Instead, the State's questioning of Hansen focused on why, after searching the Jeep and seizing several items of incriminating evidence, Hansen decided not to prepare any inventory report at all. But the State made no effort to tie the officers' decision to anything in OPD's standardized procedures.

---

[36] See cases cited *supra* notes 21 and 22.

[37] But see *Filkin, supra* note 14, 242 Neb. at 283, 494 N.W.2d at 550 (suggesting that "'no standard for the scope of the inventory other than the listing of every item of property would satisfy the relevant governmental interests'").

[38] *Filkin, supra* note 14.

Because it was not possible, on the evidence adduced, to determine whether the search in this case conformed to OPD's standardized procedures governing inventory searches, the State failed to meet its burden to show the search fell within the inventory search exception.[39] On this record, the district court should have found the search suffered from constitutional infirmities[40] and granted Briggs' motion to suppress.

But rather than granting the motion to suppress, the district court made several factual findings about the reason there was no inventory report and, based on those findings, concluded the search was "proper, reasonable, and not unconstitutional." Because the Court of Appeals relied on those factual findings in its analysis, we address them too and find they were clearly erroneous.

## 2. Trial Court's Factual Findings Were Clearly Erroneous

The district court made several related factual findings as to why, after searching Briggs' Jeep, officers failed to prepare an inventory report. It found that officers discovered "nothing of value" in the Jeep; it found "the completion of an

---

[39] See, *State v. Neely*, 236 Neb. 527, 462 N.W.2d 105 (1990) (single-judge opinion) (holding where State failed to adduce evidence that any standardized procedures were followed, inventory search exception did not apply even assuming search was conducted for inventory purposes), *abrogated on other grounds, State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017); *State v. Ray*, 9 Neb. App. 183, 609 N.W.2d 390 (2000) (holding evidence which shows only that standard policy exists, without establishing what procedures were, is inadequate to meet State's burden of proving that inventory search exception applies). Accord, *United States v. Duguay*, 93 F.3d 346 (7th Cir. 1996) (holding conflicting officer testimony as to requirements of highway patrol's impoundment policy resulted in failure to prove inventory search was governed by standardized criteria). See, also, *Wells, supra* note 14, 495 U.S. at 5 (explaining that absent evidence showing standardized procedure authorized opening of closed containers, search in which officers did so was "not sufficiently regulated to satisfy the Fourth Amendment").

[40] See *Filkin, supra* note 14.

inventory [was] not necessary" because the Jeep was "'filled to the gills'" and all of the property was "basically junk"; and it found it would have been a "waste of the [officers'] time" to prepare an inventory.

We struggle with how to construe these factual findings in our Fourth Amendment analysis, and it appears the Court of Appeals did too. The findings could arguably be construed to suggest the trial court believed that officers generally complied with OPD's procedures and that such procedures required only that "high value" property be listed on the inventory report. The findings could also arguably be construed to suggest, as the Court of Appeals concluded, that the trial court implicitly found the officers had no pretextual motive for conducting the inventory search despite the failure to prepare an inventory report. Or, given the absence of sufficient evidence showing what OPD's procedures actually required, it is possible these findings reflect nothing more than the trial court's assumptions about what a reasonable policy would require under the circumstances. But regardless of how the district court's findings are construed, they were clearly erroneous and thus did not support the court's legal conclusion that the inventory search was "proper, reasonable, and not unconstitutional."

[15] In determining whether a trial court's findings of historical fact are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses.[41] Even under this deferential standard, we find the district court's factual findings, as they regard the need to prepare an inventory report, to be clearly erroneous.

First, the finding that there was "nothing of value" in the Jeep finds no support in the record. No officer testified

---

[41] See, *Newman, supra* note 14; *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993).

the items had no value; instead, when Hansen was asked whether "there [was] anything of true value" found in the Jeep, he replied, "What we found [was] lots of bags of clothing and wigs." Even if this testimony can be fairly understood to imply there was nothing of value in the Jeep, such a finding cannot be reconciled with the video evidence in our record. The police camera footage does not show all of the property in the Jeep, but it does show a wallet, a jacket, tennis shoes, a tablet computer, phone chargers, and numerous suitcases. And Eischeid admitted that when he opened the center console, he saw credit cards, debit cards, a gift card, and cash. Given this uncontroverted evidence, the district court's factual finding that there were no items of value in the Jeep was clearly erroneous.

We also find clear error in the district court's findings that "the completion of an inventory is not necessary" or that it would be a "waste of . . . time" to prepare an inventory if, after completing the search, officers decide "all . . . the property [was] basically junk." Again, the record contains no evidence to support such a finding. There was no evidence that OPD's standardized procedures recognize any circumstance under which officers have broad discretion to forgo preparing any inventory report after conducting a search. And even if such a policy had been proved, we are not persuaded it could pass constitutional muster. To satisfy the Fourth Amendment, "'"[t]he policy or practice governing inventory searches should be designed to produce an inventory"'"[42] and to limit officer discretion.[43]

Thus, no matter how we construe the district court's findings as to why an inventory report was not necessary, the findings were clearly erroneous on this record. The Court

---

[42] *Newman, supra* note 14, 250 Neb. at 238, 548 N.W.2d at 749, quoting *Wells, supra* note 14. See, also, *Nunez, supra* note 6; *Filkin, supra* note 14.

[43] See cases cited *supra* notes 21 and 22.

of Appeals should have found as much, and it should have proceeded to independently review the trial court's ultimate determination that the search was "proper, reasonable, and not unconstitutional."[44] Had it done so, it would have reversed, concluding that the State failed to meet its burden of proving the search fell within the inventory search exception.

Instead, because it understood the trial court to have made a factual finding that the officers did not have a pretextual motive in performing the search, the Court of Appeals framed the ultimate question in this appeal as whether, under *Nunez*, the search was still reasonable. On further review, Briggs argues generally that the Court of Appeals misapplied *Nunez* to this case. As we explain next, we agree.

### 3. State v. Nunez Inapplicable

As stated earlier, *Nunez* held that the "failure to strictly follow established policy does not render an inventory search unconstitutional per se."[45] *Nunez* applies when the evidence shows officers failed to strictly follow established policy, and the case provides a framework for analyzing whether, despite errors in following the established policy, an inventory search can still be considered reasonable under the Fourth Amendment.

Here, the State failed to prove both the contents of OPD's inventory search policy and that officers conformed their conduct to that policy when searching Briggs' Jeep. That failure of proof conclusively answered the question whether the State could rely on the inventory search exception.[46] There was no need to consider *Nunez*.

Moreover, while it makes logical sense to assume that the complete failure to prepare an inventory report would

---

[44] See *Saitta, supra* note 9.

[45] *Nunez, supra* note 6, 299 Neb. 348, 907 N.W.2d at 918.

[46] See, *Filkin, supra* note 14; *Neely, supra* note 39; *Ray, supra* note 39. Accord *Wells, supra* note 14.

not comply with any reasonable standardized procedure,[47] the State's failure to prove what OPD's standardized procedures actually required made any meaningful analysis under *Nunez* impossible. Simply put, the constitutional reasonableness analysis required by *Nunez* cannot be performed where, as here, the State has not shown what the standardized procedures required and the extent of the officers' noncompliance remains unknown.

Given the State's failure to meet its burden of proof, the Court of Appeals did not have a record which permitted it to perform the constitutional reasonableness analysis required by *Nunez*. We thus agree with Briggs that *Nunez* was misapplied in this case.

## V. CONCLUSION

Because it was not possible, on the evidence adduced, to determine whether the search in this case was conducted in conformity with OPD's standardized procedures governing inventory searches, the State failed to meet its burden to show the search fell within the inventory search exception. We reverse the decision of the Court of Appeals and remand the cause with directions for that court to reverse the judgment of the district court and to remand the cause to the district court with directions to grant the motion to suppress.

Reversed and remanded with directions.

---

[47] See *Filkin, supra* note 14, 242 Neb. at 283, 494 N.W.2d at 550 (suggesting "'no standard for the scope of the inventory other than the listing of every item of property would satisfy the relevant governmental interests'").